**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant WALGREENS BOOTS ALLIANCE, INC., Plaintiff, v. TIMOTHY C. WENTWORTH, JANICE M. BABIAK, INDERPAL S. BHANDARI, GINGER L. GRAHAM, BRYAN C. HANSON, ROBERT L. HUFFINES, VALERIE B. JARRETT, JOHN A. LEDERER, STEFANO PESSINA, THOMAS E. POLEN, NANCY M. SCHLICHTING, MANMOHAN MAHAJAN, and RICK GATES, Defendants, and WALGREENS BOOTS ALLIANCE, INC., Nominal Defendant. | Case No. 1:24-cv-08244<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(2) BREACH OF FIDUCIARY DUTY;**<br>**(3) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>**(4) UNJUST ENRICHMENT; AND**<br>**(5) WASTE OF CORPORATE ASSETS**<br><br>JURY TRIAL DEMANDED |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Walgreens Boots Alliance, Inc. ("WBA" or the "Company"), against certain current and former executive officers and members of the Company's Board of Directors (the "Board") including Timothy C. Wentworth ("Wentworth"), Manmohan Mahajan ("Mahajan"), Rick Gates ("Gates"), Janice M. Babiak ("Babiak"), Inderpal S. Bhandari ("Bhandari"), Ginger L. Graham ("Graham"), Bryan C. Hanson ("Hanson"), Robert L. Huffines ("Huffines"), Valerie B. Jarrett ("Jarrett"), John A.

Lederer ("Lederer"), Stefano Pessina ("Pessina"), Thomas E. Polen ("Polen"), and Nancy M. Schlichting ("Schlichting") (collectively, the "Individual Defendants," and together with WBA, the "Defendants") for breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WBA, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of WBA against the Individual Defendants for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between October 12, 2023 and June 26, 2024, inclusive (the "Relevant Period").

2. WBA is a multinational company that owns the retail pharmacy chains Walgreens in the United States and Boots in the United Kingdom, as well as several pharmaceutical manufacturing and distribution companies. The Company was formed in December 2014,

following Walgreens' acquisition of the remaining outstanding shares of Alliance Boots.

3. During the Relevant Period, the Individual Defendants provided or caused the Company to provide misleading information to the public concerning WBA's expected revenue for the fiscal year 2024, including statements exuding confidence in the Company's pharmacy segment's brand inflation, volume growth, cost execution, discipline, and overall contribution to the Company.

4. For instance, on October 12, 2023, the Company published a press release providing guidance and expectations for the full fiscal year 2024, including an expected "adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution."

5. During an earnings call with analysts the same day, the Company's Global Chief Financial Officer ("CFO") Manmohan Mahajan ("Mahajan") stated "we expect U.S. retail pharmacy underlying adjusted operating income to be driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy." Defendant Mahajan also outlined the Company's "prudent approach" to "sequential improvement," including by lowering the Company's cost base, optimizing the U.S. Healthcare segment's clinic footprint, experiencing growth from retail initiatives, and noting the benefits the seasonality of the holiday season as well as cold and flu season brings to the Company.

6. On June 27, 2024, however, the truth began to emerge when the Company issued a press release announcing third quarter earnings for the full fiscal year 2024, stating "[a]djusted EPS was $0.63, down 36.6 percent on a constant currency basis compared to the year-ago quarter." The press release further stated that the Company was "[l]owering fiscal 2024 adjusted EPS guidance to $2.80 to $2.95 reflecting challenging pharmacy industry trends and a worse-than-

expected U.S. consumer environment."

7. On an earnings call held the same day, WBA's Chief Executive Officer ("CEO"), Defendant Wentworth, explained the disappointing results, stating:

> In U.S. Retail Pharmacy, we witnessed continued pressure on the U.S. consumer. Our customers have become increasingly selective and price-sensitive in their purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.

8. Critically, Defendant Wentworth added that "[w]e are at a point where the current pharmacy model is not sustainable, and the challenges in our operating environment require we approach the market differently."

9. Following this news, WBA's stock price fell 22.16%, or $3.47 per share, to close at $12.19 per share on June 27, 2024.

10. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the Company's pharmacy division was not equipped to handle the ongoing challenges in the industry; (2) as a result, WBA overemphasized confidence in the pharmacy segment's ability to carry the Company; (3) the pharmacy segment would require significant restructuring to create a sustainable model; and (4) WBA did not have sufficient or effective risk management or compliance controls and procedures necessary to prevent such misstatements. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12. Further, in October 2023, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase approximately 3.1 million shares of WBA common stock at artificially inflated prices, at a total cost of over $69.3 million. As the Company's stock was actually worth only $12.19 per share, the price at which it was trading when markets closed on June 27, 2024, the Company overpaid for repurchases of its own stock by over $31.5 million in total.

13. As a result of the foregoing, a securities fraud class action was filed against the Company, and Defendants Wentworth, Mahajan, and Gates captioned *Bhaila v. Walgreens Boots Alliance, Inc. et al*, Docket No. 1:24-cv-05907 (N.D. Ill. Jul 12, 2024) (the "Securities Class Action"). The Securities Class Action has exposed the Company to massive class-wide liability.

14. In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

15. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' Wentworth's, Mahajan's and Gates's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not

being disinterested and/or independent directors, a majority of WBA's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act. Plaintiff's claims also raise a federal question under Section 14(a) of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

19. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant WBA is headquartered in this District and conducts business in this District, and several of the acts and omissions charged herein occurred in substantial part in this District.

## PARTIES

***Plaintiff***

21. Plaintiff is and has been a continuous shareholder of WBA common stock since at least November 2020.

***Nominal Defendant***

22. Nominal Defendant WBA is incorporated under the laws of Delaware, with its principal executive offices located at 108 Wilmot Road, Deerfield, Illinois 60015. WBA's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "WBA."

***Individual Defendants***

23. Defendant Wentworth has served as the Company's CEO and as a member of the Board since October 2023. Defendant Wentworth is also named as a defendant in the Securities Class Action.

24. Defendant Babiak has served as a member of the Board since April 2012. Defendant Babiak also serves as Chair of the Board's Audit Committee and as a member of the Finance and Technology Committee. As set forth in the Schedule 14A the Company filed with the SEC on December 8, 2024 ("2023 Proxy"), Babiak received $325,000 in compensation from the Company in fiscal year 2023.

25. Defendant Bhandari has served as a member of the Board since September 2022. Defendant Bhandari also serves as a member of Board's Audit Committee, Finance and Technology Committee, and Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy, Bhandari received $115,293 in compensation from the Company in fiscal year 2023.

26. Defendant Graham has served as a member of the Board since April 2010 and as the Company's Lead Independent Director since October 2022. Defendant Graham also serves as

Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation and Leadership Performance Committee. As set forth in the 2023 Proxy, Graham received $366,848 in compensation from the Company in fiscal year 2023.

27. Defendant Hanson has served as a member of the Board since October 2022. Defendant Hanson also serves as a member of the Board's Compensation and Leadership Performance Committee and the Finance and Technology Committee. As set forth in the 2023 Proxy, Hanson received $84,615 in compensation from the Company in fiscal year 2023.

28. Defendant Huffines has served as a member of the Board since January 2024. Defendant Huffines also serves as a member of the Board's Finance and Technology Committee.

29. Defendant Jarrett has served as a member of the Board since October 2020. Defendant Jarrett also serves as a member of the Board's Audit Committee, Compensation and Leadership Performance Committee, and Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy, Jarrett received $300,000 in compensation from the Company in fiscal year 2023.

30. Defendant Lederer has served as a member of the Board since April 2015. Defendant Lederer also serves as Interim Chair of the Board's Finance and Technology Committee and as a member of the Compensation and Leadership Performance Committee and the Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy, Lederer received $315,000 in compensation from the Company in fiscal year 2023.

31. Defendant Pessina has served as a member of the Board since April 2012 and as the Board's Executive Chairman since March 2021. Defendant Pessina previously served as the Company's CEO from July 2015 until March 2021. As set forth in the 2023 Proxy, Pessina received $7,573,960 in compensation from the Company in fiscal year 2023. According to the

2023 Proxy, Defendant Pessina beneficially owned 147,435,917 shares of the Company's common stock, equal to 17.1% of the Company's outstanding shares, as of November 27, 2023.

32. Defendant Polen has served as a member of the Board since July 2023. Defendant Polen also serves as a member of the Board's Finance and Technology Committee. As set forth in the 2023 Proxy, Polen received $14,130 in compensation from the Company in fiscal year 2023.

33. Defendant Schlichting has served as a member of the Board since October 2006. Defendant Schlichting also serves as Chair of the Board's Compensation and Leadership Performance Committee and as a member of the Board's Audit Committee. As set forth in the 2023 Proxy, Schlichting received $319,974 in compensation from the Company in fiscal year 2023.

34. Defendant Mahajan has served as the Company's EVP and CFO since March 2024. Defendant Mahajan previously served as the Company's SVP and Interim CFO since July 2023 and as the Company's SVP, Global Controller and Chief Accounting Officer from July 2021 until July 2023. As set forth in the 2023 Proxy, Mahajan received $1,826,108 in compensation from the Company in fiscal year 2023. Defendant Mahajan is also named as a defendant in the Securities Class Action.

35. Defendant Gates has served as the Company's SVP and Chief Pharmacy Officer since March 2023, after having previously served as WBA's Senior Vice President of Pharmacy and Healthcare. Defendant Gates is also named as a defendant in the Securities Class Action.

36. Defendants referenced in paragraphs 23 through 35 are herein referred to as the "Individual Defendants."

37. The Individual Defendants, together with WBA, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38. By reason of their positions as officers and/or directors of WBA, and because of their ability to control the business and corporate affairs of WBA, the Individual Defendants owed WBA and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WBA in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WBA and its shareholders so as to benefit all shareholders equally.

39. Each director and officer of the Company owes to WBA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40. The Individual Defendants, because of their positions of control and authority as directors and/or officers of WBA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41. To discharge their duties, the officers and directors of WBA were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of WBA, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43. As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44. To discharge their duties, the officers and directors of WBA were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of WBA were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to WBA's own Code of Conduct and Ethics (the "Code of Conduct"), Code of Ethics for CEO and Financial Executives ("Code of Ethics") and Corporate Governance Guidelines;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how WBA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of WBA and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that WBA's operations would comply with all applicable laws and WBA's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

45. Each of the Individual Defendants further owed to WBA and the shareholders the duty of loyalty requiring that each favor WBA's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or

knowledge of the affairs of the Company to gain personal advantage.

46. At all times relevant hereto, the Individual Defendants were the agents of each other and of WBA and were at all times acting within the course and scope of such agency.

47. Because of their advisory, executive, managerial, and directorial positions with WBA, each of the Individual Defendants had access to adverse, non-public information about the Company.

48. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WBA.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of WBA, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of WBA and at all times acted within the course and scope of such agency.

## WBA'S CODE OF CONDUCT AND CODE OF ETHICS

55. WBA's Code of Conduct "outlines the principles and behaviors" that all of the Company's directors, officers and other employees are expected to follow in their daily work.

56. Failure to comply with the Code of Conduct may result in disciplinary action "up to and including termination of employment."

57. The Code of Conduct instructs readers that the Company "succeed[s] on the strength of our products, services and people. We do not try to gain an advantage through unethical or illegal means."

58. The Code of Conduct further outlines the Company's commitment to its shareholders. In a section titled "We maintain accurate books and records," the Code of Conduct states: "Our books and records explain and document the financial and operational details, history

and decisions of our business. Examples include invoices, expense reports, inventory and pricing data, contracts and regulatory filings." In outlining the Company's commitment to accurate books and records, the Code of Conduct provides, in relevant part:

> We strive to keep complete and accurate company records that fairly reflect our business, and we submit timely reports to government regulators. We follow applicable laws, regulations, accounting standards and WBA Policies related to our records. We do not improperly alter or misrepresent records, regardless of how small the change or amount may be.

59. With respect to compliance with insider trading laws, the Code of Conduct states, in relevant part:

> Insider trading occurs when someone illegally uses material, non-public information when trading in stock or other securities. "Material" means the information would be important to someone who is considering buying, selling or holding a stock or other security. "Non-public" means the information has not been shared widely with the public. Examples of material, nonpublic information include financial results, potential sales, mergers and acquisitions, significant contracts, major litigation and joint ventures.
>
> Insider trading can also occur when someone discloses material, non-public information to others, including friends and family, to use for their own financial benefit. This is called tipping.
>
> <u>Our commitment</u>
>
> We do not trade on or improperly share material, non-public information. We follow insider trading and securities laws and regulations, and we handle material, non-public information in accordance with applicable requirements. We forbid insiders from using or disclosing material, non-public information for personal gain.

60. In a section titled "We communicate responsibly," the Code of Conduct states, in relevant part:

> Communication is anything we, as a company, convey through spoken or written words or images. It includes internal emails, articles and anything we say publicly to investors, analysts, the media or on social media. Responsible communication aligns with our company culture, reflects our core values and follows our communication guidelines.

Our commitment

We are responsible and professional in how we communicate – internally and externally. We are mindful of our reputation, and we only allow authorized representatives to communicate externally on behalf of WBA. We require our team members to follow applicable WBA policies when representing us, including on social media. We understand when we may be seen as communicating on behalf of the company as opposed to as an individual, and we ask for guidance and approval from Corporate Communications if we are unsure.

Why it matters

Our reputation influences behaviors and perceptions and is key to maintaining trust among our stakeholders, patients and customers. When we communicate responsibly with messages that are clear, transparent and consistent, this strengthens our reputation and builds trust in WBA.

61. In addition to the Code of Conduct, the Company maintains the Code of Ethics applicable to the CEO and all senior financial officers, including the CFO.

62. The Code of Ethics requires the CEO and all senior financial officers to certify to the following principles and responsibilities governing professional and ethical conduct:

1. I act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.
2. I provide accurate, complete, objective, relevant, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission.
3. I comply with applicable rules and regulations of federal and state governments.
4. I act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing my independent judgement to be subordinated.
5. I share knowledge and maintain skills important and relevant to the needs of the Company.
6. I proactively promote ethical behavior as a responsible partner among peers in my work environment.
7. I achieve responsible use of and control over all assets and resources employed or entrusted to me.

## WBA'S AUDIT COMMITTEE CHARTER

63. WBA's Audit Committee Charter states that the purpose of the Audit Committee is assist the Board in its oversight of:

> (1) the integrity of the Company's financial statements and its accounting and financial reporting process; (2) the soundness of the Company's systems of internal accounting and financial controls; (3) the annual independent audit of the Company's financial statements; (4) the independent auditor's qualifications, performance and independence; (5) the Company's compliance with legal and regulatory requirements; and (6) the performance of the Company's independent auditor and internal audit function.

64. With respect to the Audit Committee's authority and delegation, the Audit Committee Charter states:

> The Committee has the authority to investigate any activity of the Company in order to adequately discharge its responsibilities and to expand its knowledge of the Company's financial operations. The Committee shall have direct access to the Company's independent auditor, the General Auditor (who is responsible for the internal audit function), any other executive or manager of the Company, and the records of the Company.
>
> The Committee has the authority to retain accountants, outside counsel and other advisors as the Committee deems appropriate in its sole discretion to assist the Committee in the performance of its duties. The Committee is authorized to approve related fees and retention terms and shall be provided with appropriate funding, as determined by the Committee, for payment of compensation to such accountants, outside counsel and other advisors, as well as for ordinary administrative expenses that the Committee deems appropriate in carrying out its duties.
>
> The Committee may also delegate to one or more subcommittees such of its duties as the Committee deems necessary and appropriate.

65. The Audit Committee Charter further states that, consistent with its purpose and authority, the Audit Committee's specific duties include, in relevant part:

> 1. <u>Review of Quarterly and Annual Financial Statements</u>. Review and discuss with management and the independent auditor the Company's annual audited financial statements and unaudited quarterly financial statements, including any critical audit matters and disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to filing with the SEC or distribution to stockholders and the public.

* * *

3. Certifications. Review any disclosures made by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls, or material weaknesses therein, and any fraud involving management or other employees who have a significant role in the Company's internal controls.

4. Inclusion of Financial Statements in Form 10-K. Upon completing the required review, make a recommendation to the Board that the Company's annual financial statements be included in the Form 10-K and filed with the SEC.

5. Review of Earnings Releases. Discuss with management the Company's earnings press releases, including the use of "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

6. Report for Inclusion in Proxy Statement. Prepare a report of the Committee to be included in the Company's proxy statement, as required by applicable rules and regulations.

66. With respect to risk assessment and risk management matters, the Audit Committee Charter states, in relevant part:

8. Risk Assessment and Risk Management. Regularly review and discuss with management, no less than annually, the Company's enterprise risk assessment and key enterprise risks, including major litigation and financial risks, as well as information security and technology risks, including cybersecurity and risks related to climate change, sustainability and other environmental, social and governance-related matters. Periodically review the steps management has taken to monitor and control such risk exposures, including the risk assessment and risk management policies and procedures.

67. Further, the Audit Committee Charter requires that the Audit Committee "[p]eriodically meet with the Company's Chief Legal Officer and Chief Compliance Officer, or other senior members of the Company's legal and compliance departments, and discuss any significant legal, compliance, or regulatory matters that may have a material impact on the Company's business, financial statements, or compliance policies."

68. With respect to "Disclosure Controls and Procedures and Internal Control Over

Financial Reporting," the Audit Committee's responsibilities include:

> Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls over financial reporting, including any significant deficiencies or material weaknesses and significant changes in internal controls.

## SUBSTANTIVE ALLEGATIONS

***Background***

69. WBA's business is split into three distinct categories: retail and pharmacy within the United States, international sales, and United States healthcare.

70. During the Relevant Period, the Company publicly overstated WBA's expected revenue for fiscal year 2024 by exuding confidence in the Company's pharmacy division's brand inflation, volume growth, cost execution, and discipline, as well as the pharmacy division's overall contributions to the Company.

71. Further, in October 2023, the Company repurchased approximately 3.1 million shares of WBA common stock, at a total cost to the Company of over $69.3 million.

***Materially False and Misleading Statements***

72. On October 12, 2023, the Company issued a press release announcing fiscal year 2024 guidance. The press release stated, in relevant part:

> *Fiscal 2024 guidance*
>
> - Expecting fiscal 2024 adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution
> - Expecting U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million
> - Not providing guidance beyond fiscal 2024; continuing to evaluate macroeconomic trends and challenges, and expecting to provide long-term guidance, if any, in the future

73. The same day, during an earnings call with analysts and investors, the Company's

CFO, Defendant Mahajan, detailed WBA's growth expectations and discussed the Company's retail pharmacy segment. During the call, Defendant Mahajan stated "we expect U.S. retail pharmacy underlying adjusted operating ***income to be driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy***."[1]

74. Defendant Mahajan further stated:

> U.S. Retail Pharmacy segment sales are projected to be flat to up 2%. AOI will be negatively impacted by approximately 8 percentage points from the lower COVID-19 contributions and roughly 11 percentage points of lower sale and leaseback gains. Excluding these impacts, the underlying business is projected to drive 5% to 10% AOI growth.
>
> I will now take you through the key business drivers. First, we anticipate script volume growth driven by overall market growth. On reimbursement, we have roughly 75% of the contract signed for calendar year '24. We do expect reimbursement pressure to be less of a headwind in fiscal '24 than in fiscal '23.
>
> We're projecting approximately 5 million COVID vaccinations in 2024. Quarter-to-date, we're well on track and have already administered over 3 million COVID vaccinations. In retail, we expect margins to benefit from our category performance improvement program and a roughly 1 percentage point increase in own brand penetration.
>
> At the same time, we're adopting a prudent approach. We see a continuation of the challenging trends that impacted the second half of fiscal 2023. We're projecting flat comparable sales due to a milder cough, cold, and flu season year-on-year, lower COVID OTC test kit volume and continued consumer pressure. We're also planning a higher level of shrink, which has been increasing in the last several months and continues to represent a serious systemic issue across the retail industry. Within SG&A, we expect to achieve over $1 billion of cost savings during fiscal 2024, as Ginger has already described.

75. With respect to expectations beyond the quarter, Defendant Mahajan further added:

> Moving beyond the first quarter, ***we will see sequential improvement***, and I will discuss the top 4 drivers. First, we're executing a series of actions ***to lower our cost base***. These will have limited impact on the first quarter, but ***will start to ramp in the second quarter***. There is adjusted EPS benefit of $0.50 to $0.60 in the balance of the year compared to the first quarter.
>
> Second, in our U.S. Healthcare segment, we expect profitability to improve from

[1] Emphases added unless otherwise indicated.

> optimizing the clinic footprint, growing patient panels and realigning costs. ***Third, we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs***. Finally, seasonality plays a role in our business, benefiting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season.

76. In response to an analyst question concerning "pull-through and opportunity on" scripts and drivers of operating profit in WBA's core pharmacy business, Defendant Gates stated:

> It's a great question. And I'll kind of give the building blocks to script growth that we're expecting this year. Obviously, ***we saw a weaker end of the fiscal year from market growth, specifically around cough, cold, flu, some of the respiratory and some of the Medicaid redetermination, which shows some lower utilization from consumers***.
>
> ***So the primary driver of the market coming back in line with what the expectations are from IQVIA and others***. And so that's really what we've seen as we started into the first quarter of the fiscal year, and market is going to be a big underpinning to what we do. But ***we continue to advance our adherence programs that are really driving incremental script growth***, partnering with health plans and others to really drive better adherence. And obviously, that does help on the script side.
>
> ***You're also going to see some access initiatives, especially going into calendar year '24, which should be some tailwinds for us***. I think some changing dynamics in the marketplace or having individuals choose more open access and things that should give us access differently than what we've seen in the past. And the last one would be that we're really focused on potential profile buys and opportunities given some of the changes in the marketplace.
>
> So I think ***there's a bunch of drivers that really give us confidence that we have tailwinds behind us in the script growth***.

77. Also on the call, one analyst inquired as to cost savings and "where the CapEx cuts are coming from.... [a]nd... how they're being apportioned[.]" Defendant Mahajan responded:

> Yes, sure. So let me start with the cost savings. We're expecting at least $1 billion of cost savings. And I think the way you need to think about this is majority of this is going to be coming from our U.S. retail pharmacy business.
>
> And 3 or 4 components, let me just walk through them real quick. Ginger talked about we're looking at all costs related to headquarter support office, and we're going line by line. So that's one. We are closing unprofitable locations, and that's

> going to be accretive in the year.
>
> We have optimized store hours in certain locations to match with where the local market already is. And I think the other big component of this is we've looked at all the project spend and all the projects that exist across the company. And I think the focus is there twofold. More importantly, it's how do we focus the organization on customer-focused initiatives so that we deliver more value. But then obviously, reducing the spend on the income statement. So that's on the cost side.
>
> Look, on the CapEx side, I'd say if you look at the trend we've seen, you go back to maybe fiscal '22, I think we were at around $1.4 billion in the year. We increased to -- this is '21, sorry. And then we went up $300 million. And again, last year was the peak of $2.1 billion. And so what we're trying to achieve here is getting back to kind of the normal levels of CapEx here. ***Two parts that are going to contribute into this again is, one, as John talked about, we're very focused in our Healthcare segment on profitable growth. And so we will see a lower level of CapEx or growth CapEx coming out from U.S. Healthcare segment***.
>
> ***And then if you look at a couple of drivers of the CapEx on the U.S. retail pharmacy, micro fulfillment centers as well as our digital transformation, some of those things are coming to fruition***. And Ginger talked about taking a pause on micro fulfillment center so that we increase the productivity and achieve the desired results there first. So those are some of the factors, high level that are driving the CapEx reduction.

78. On December 8, 2023, WBA filed the 2023 Proxy with the SEC. Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth solicited the 2023 Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

79. With respect to the Board's "Role in Risk Oversight," the 2023 Proxy stated, in relevant part:

> We face a broad array of risks, including market, operational, strategic, legal, regulatory, reputational, cybersecurity/data security, environmental, social and financial risks. Our management is responsible for establishing and maintaining systems to manage these risks. The Board exercises oversight over the elements and dimensions of major risks that we face. The Board administers its risk oversight function as a whole and through its Committees.
>
> We have established a global enterprise risk management ("ERM") program, which is led by our Global Chief Compliance and Ethics Officer ("Chief Compliance

Officer"). Our Chief Compliance Officer has a dual reporting line to the Chair of the Audit Committee and the Company's Global Chief Legal Officer. Our Governance, Risk and Compliance ("GRC") committee, which is composed of key members of senior management, oversees and monitors the activities of our ERM program and reviews, on a regular basis, the top current and emerging enterprise risks we face, as well as relevant risk mitigation activities. Since the strategic combination of Walgreens and Alliance Boots in 2014, the Company has regularly enhanced the overall ERM program and expanded its scope to align with the Company's business. Currently, in addition to the executive-level enterprise-wide GRC committee, the Company has established similar GRC committees within each of its three business segments. In addition, risk assessments are created by each business unit and consolidated into segment and Company-level risk assessments and mitigation plans. Our ERM leader meets regularly with senior members of the Company's global leadership team and other members of the Company's oversight and support functions and specific risk owners to help ensure the latest insights and mitigation are incorporated into the Company's risk register.

This global ERM approach helps the Board and its Committees receive relevant information about risks and understand our risk management process, the participants in the process, and key information gathered through the process.

The purpose of the ERM process is to identify risks that could affect us and the achievement of our objectives; to understand, assess, and prioritize those risks; to communicate identified events and risks quickly and effectively to necessary parties across the Company; and to facilitate the implementation of risk management strategies and processes across the Company.

80. In discussing the Code of Conduct, the 2023 Proxy stated, in relevant part:

We have adopted a Code of Conduct and Ethics that applies to all of our employees, officers and directors and that the Board, through the Nominating and Governance Committee, reviews annually. We have also adopted a Code of Ethics for our CEO and Financial Executives that applies to and has been signed by our CEO, Interim Global Chief Financial Officer, Interim Global Controller and Chief Accounting Officer and other senior financial officers. These policies can be found at https://investor.walgreensbootsalliance.com/governance.

We intend to promptly disclose on our website, in accordance with applicable rules, any required disclosure of changes to or waivers, if any, of our Code of Conduct and Ethics or our Code of Ethics for our CEO and Financial Executives.

81. On January 4, 2024, WBA issued a press release announcing results for the first quarter of fiscal 2024. With respect to fiscal 2024 guidance, the press release stated:

*Fiscal 2024 guidance*

- Maintaining fiscal 2024 adjusted EPS guidance of $3.20 to $3.50, with underly-ing earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution
- Maintaining U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) million to $50 million

82. With respect to adjusted earnings per share, the press release revealed a decrease of "43.1 percent to $0.66, ***down 43.7 percent on a constant currency basis reflecting challenging retail market trends in the U.S. and a 21 percentage point headwind from a higher tax rate***." The press release also revealed that: (1) for sales numbers in the first quarter, "sales increased 10.0 percent year-over-year to $36.7 billion, up 8.7 percent on a constant currency basis"; and (2) for the Company's quarterly dividend payment, there would be "a 48 percent reduction in quarterly dividend payment to $0.25 per share." The press release also stated the following:

> First quarter loss per share was $0.08 compared to a loss per share of $4.31 in the year-ago quarter; first quarter results included $278 million after-tax charge for fair value adjustments on variable prepaid forward derivatives related to the monetization of Cencora shares.

83. Also on January 4, 2024, the Company hosted an earnings call with analysts and investors to discuss first quarter fiscal 2024 results. During the call, WBA's CEO, Defendant Wentworth, provided updates on the Company's performance, stating in relevant part:

> As you are by now aware, WBA started fiscal 2024 with on-plan results despite a weak retail environment in the U.S. First quarter adjusted EPS came in at $0.66, ***reflecting execution and cost discipline in U.S. Retail Pharmacy***, continued strong performance in International and progress with profitability initiatives in U.S. Healthcare. ***We are maintaining full year adjusted EPS guidance against a challenging backdrop. I must give credit here to the hard work and dedication of our teams. We are navigating the accumulating consumer pressures from inflation and depleted savings and somewhat slower-than-anticipated market trends in pharmacy script volumes, including impacts from a weaker respiratory season and Medicaid redetermination.***
>
> Retail customers in the United States are under stress and making deliberate choices to seek value, evidenced in our own brands up 90 basis points in the quarter, while demand for seasonal and discretionary categories remains weak.

> ***At the same time, our teams executed well during the quarter on delivering pharmacy services, including vaccines and maintaining our overall share of script volume in the U.S.*** International was once again a bright spot in the quarter, building on last year's solid growth. Upside was led by Boots U.K. with further share gains in retail, while both retail and pharmacy delivered gross profit improvement despite inflationary cost pressures. Germany also achieved share gains.

84. On the call, Defendant Wentworth further added:

> So macroeconomic conditions are clearly difficult for retailers, and ***I fully acknowledge the structural headwinds in our core pharmacy business*** and the growing pains in our Healthcare segment. None of this is a surprise to me. I came to WBA eyes wide open with a clear mandate to act with everything on the table in terms of putting our business on the right track.
>
> In that context, we are taking swift actions to rightsize costs and increase cash flow across the company. We remain on pace toward $1 billion in cost savings this year. Our U.S. organizational efforts have resulted in a planned headquarter support office workforce reduction of approximately 20%. Over the past 2 months, we have prioritized projects and capital spend to focus on the customer-facing activities that matter most.

85. With respect to improvements that the Company was attempting to make to the pharmacy division, Defendant Wentworth added, in pertinent part:

> We are enabling pharmacists to spend less time on tasks and more time on meaningful interactions and providing essential care, from health screenings to immunizations to diagnostic testing and treatment. Our network of micro fulfillment centers is helping to stabilize staffing and pharmacy hours, reduce workflow pain points and free up capacity to drive the outcomes that matter most to our patients and partners.
>
> You'll remember in October we mentioned a pause in the rollout to optimize productivity. We are happy with our continued progress and the importance of these centers in our overall strategy. We are also piloting virtual pharmacy to redefine connected care, further increase patient access, enhance workplace flexibility, and extend our pharmacist reach.

86. Also on the call, Defendant Mahajan spoke to the Company's improvement in the pharmacy segment, stating:

> AOI declined 37.2% year-on-year, mainly driven by lower retail sales volume and margin, including higher levels of shrink. ***AOI was positively impacted by***

***execution in our pharmacy services and progress on cost savings initiatives.***

> Let me now turn to U.S. Pharmacy. ***Pharmacy comp sales increased 13.1%, mainly driven by brand inflation and higher contribution from pharmacy services***. COVID-19 vaccines have now shifted to a commercial model consistent with other vaccinations. Comp scripts grew 1.8%, excluding immunizations, in line with the overall prescription market.

87. With respect to the US retail division, Defendant Mahajan added:

> Challenging macroeconomic conditions and an anticipated slow start to the cough, cold, flu season contributed to a weaker retail performance year-on-year. Comparable sales declined 5% in the quarter.
>
> There are 3 main drivers. First, a weaker respiratory season had an impact of approximately 160 basis points through the health and wellness category. Cough, cold, flu serves as a primary trip driver. As a result, we also experienced lower attachment sales due to the weaker season, which are incremental to the 160 basis points impact. Second, customers continue to pull back on discretionary spending, and actively seek out promotional opportunities. As a result, we saw an approximately 90 basis points impact from weaker holiday seasonal sales. Lastly, our decision to close most of our stores on Thanksgiving this year to further support our store team members led to a headwind of about 60 basis points.
>
> While these factors resulted in lower sales across all categories, we experienced more pronounced declines in consumables and general merchandise and in health and wellness.
>
> Retail gross margin was negatively impacted by 110 basis points due to higher shrink. Retail shrink continues to be a systemic issue across the retail industry.

88. Defendant Mahajan then provided the following outlook for the remainder of fiscal 2024:

> We are maintaining our fiscal '24 adjusted EPS guidance. We expect certain incremental tailwinds and headwinds in a challenging environment compared to our prior outlook.
>
> ***On the tailwinds, with strong execution to date, we now expect pharmacy services to deliver ahead of our initial plan***. We also anticipate an improvement in our full year adjusted effective tax rate as a result of tax planning initiatives, with a revised range of 15% to 17%, compared to the prior outlook of 19% to 20%.
>
> On the headwinds. ***First, we expect the pullback in consumer spending and shifting behaviors will continue to impact our retail sales in the U.S. in the short***

> ***term, while improving in the second half.*** We now expect retail comp sales for fiscal '24 to decline low single digits compared to the prior outlook of flat. Second, we expect approximately $125 million in reduced sale and leaseback gains versus our prior outlook. As we explained in October, this is the last year of anticipated sale leaseback transactions. ***Lastly, we also forecast slightly lower overall market volume growth for prescriptions compared to our previous expectations.***
>
> *  *  *
>
> Third, ***we cautiously expect modest level of retail market growth against an easier second half comparison***. Finally, our tax rate was elevated in the first quarter. We expect favorability in the remainder of the year.

89. On March 28, 2024, the Company issued a press release reporting results from the second quarter of fiscal 2024, including a 3.4 percent increase in adjusted EPS and a 6.3% increase in sales year over year. The Company also announced it was altering guidance:

> Narrowing fiscal 2024 adjusted EPS guidance to $3.20 to $3.35, reflecting challenging retail environment in the U.S., early wind-down of sale-leaseback program, and lower earnings due to Cencora share sales, offset by execution in pharmacy services and a lower adjusted effective tax rate.

90. Despite this, Defendant Wentworth noted that the Company "remain[ed] confident in our goal of achieving $1 billion in cost savings this year. We are continuing to strategically review our portfolio over the next three months in an effort to ensure it drives growth and delivers value."

91. Also on March 28, 2024, the Company hosted an earnings call with analysts and investors to discuss results. During the call, Defendant Wentworth detailed the pharmacy division's performance:

> ***We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio***. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing. We're seeing benefits such as improved NPS scores, patient retention

> and adherence …earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as demand for pharmacy services increases while the industry faces a pronounced labor shortage. We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.
>
> WBA's second quarter operational results were in line with our expectations despite continued challenges in the U.S. retail environment. ***Adjusted EPS of $1.20 reflects good execution and cost discipline in our U.S. Retail Pharmacy segment***, continued strong performance in International, our first quarter of positive adjusted EBITDA in U.S. Healthcare and positive impacts from tax planning benefits.

92. Also during the call, Defendant Wentworth elaborated on the Company's narrowing guidance, noting the guidance "***reflects a challenging retail environment in the U.S.*** and our decisions to both wind down the sale-leaseback program and to sell additional shares of Cencora in a further effort to simplify our financial reporting."

93. With respect to future plans, Defendant Wentworth stated:

> Over the next 3 months, we will continue the intense review of our portfolio of assets in an effort to ensure that each contributes to the growth we aspire to deliver and drives our go-forward strategy to be the leading retail pharmacy and health services partner that creates deep relationships and trust.
>
> Let me share further detail on the progress happening across our businesses to date. ***In our U.S. Retail Pharmacy business, we are navigating a challenging backdrop and exploring innovative pathways to boost profitability and growth.*** Within retail, our U.S. customer is confronting considerable pressure from multiyear inflationary trends and depleted household savings with U.S. household debt at record levels and delinquency rates on the rise.

94. Next, Defendant Wentworth spoke to earlier-discussed initiatives in WBA's pharmacy division:

> We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core

> dispensing.
>
> We're seeing benefits such as improved NPS scores, patient retention and adherence . . . earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as demand for pharmacy services increases while the industry faces a pronounced labor shortage. We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.

95. Later on the same call, Defendant Mahajan provided additional detail on the pharmacy segment's performance:

> Let me now turn to U.S. pharmacy. ***Pharmacy comp sales increased 8.7%, mainly driven by brand inflation, volume growth and contribution from pharmacy services***. Comp scripts grew 2.9%, excluding immunizations, in line with the overall prescription market. The ongoing impact of Medicaid redeterminations continued to negatively impact overall market growth.
>
> ***Pharmacy Services performed better than expectations, driven by our vaccines portfolio. Pharmacy adjusted gross profit was down slightly versus the prior year quarter with margin negatively impacted by brand mix impacts and reimbursement pressure net of procurement savings.***
>
> Turning next to our U.S. Retail business. We continue to see a challenging retail environment with a shift in discretionary spend away from the drug channel as consumers seek value. Comparable retail sales declined 4.3% in the quarter.
>
> There were 3 main drivers. First, as consumers continue to pull back on discretionary spending, we saw an impact of approximately 170 basis points from weaker sales in holiday seasonal and general merchandise categories.
>
> ***Second, as expected, we saw a weaker than normal respiratory season, which directly impacted comparable sales by approximately 90 basis points. Third-party data showed flu, cold and respiratory activity was down 6% compared to the prior year quarter. In addition, as cough, cold, flu serves as a primary trip driver, there was also an incremental impact from the lower attachment sales***.

96. Concerning the Company's projections and guidance for the remainder of fiscal 2024, Defendant Mahajan provided:

> ***We are narrowing our fiscal '24 adjusted EPS guidance to $3.20 to $3.35***. The updated range incorporates a challenging U.S. retail environment, lower sale leaseback gains and reduced Cencora equity income, ***offset by the execution in***

> ***pharmacy services and a lower adjusted effective tax rate***.
>
> ***On the tailwinds, we continue to see strong execution in our pharmacy services business, which has delivered results ahead of our initial plan to date***. In addition, we now expect our adjusted effective tax rate to be under 5%.
>
> On the headwinds, we expect the challenging retail backdrop will continue to negatively impact our U.S. retail sales in the short term. We now expect fiscal '24 retail comp sales to be down approximately 3%. Second, with the early wind down of the sale-leaseback program, no material gains are expected in the future.

97. The statements detailed above were false and misleading when made, and omitted material facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the Company's pharmacy division was not equipped to handle the ongoing challenges in the industry; (2) as a result, WBA overemphasized confidence in the pharmacy segment's ability to carry the Company; (3) the pharmacy segment would require significant restructuring to create a sustainable model; and (4) WBA did not have sufficient or effective risk management or compliance controls and procedures necessary to prevent such misstatements. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***The Truth Emerges***

98. On June 27, 2024, the Company issued a press release detailing results from the third quarter of fiscal 2024, revealing a disappointing adjusted EPS of $0.63, down 36.6% compared to the prior year. The press release also reduced full-year guidance, "[l]owering fiscal 2024 adjusted EPS [guidance to $2.80 to $2.95 reflecting challenging pharmacy industry trends and a worse-than-expected U.S. consumer environment."

99. Defendant Wentworth further noted in the press release that the Company continues "to face a difficult operating environment, including persistent pressures on the U.S. consumer and

the impact of recent marketplace dynamics which have eroded pharmacy margins."

100. Also on January 27, 2024, the Company hosted an earnings call with analysts and investors. Defendant Wentworth noted on the call that the "quarter's results were not in line with our expectations."

101. With respect to the US retail pharmacy segment, Defendant Wentworth stated, in relevant part:

> ***[W]e witnessed continued pressure on the U.S. consumer. Our customers have become increasingly selective and price-sensitive in their purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach.*** We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.
>
> We also ***continue to face an incrementally challenging pharmacy industry***. Recent trends, such as branded mix impacts and increased regulatory and reimbursement pressures, including fluctuations in NADAC pricing, have negatively impacted pricing dynamics. Additionally, the script market is growing but continues to trail below pre-pandemic growth levels.
>
> These headwinds have affected our performance and are materially weighing on our ability to serve patients profitably. W***e are at a point where the current pharmacy model is not sustainable***, and the challenges in our operating environment require we approach the market differently.

102. Also on the call, Defendant Mahajan admitted:

> Adjusted EPS declined 25% on a constant currency basis due to the softer US Retail Pharmacy performance and significantly lower sale leaseback gains. This was partly offset by cost-saving initiatives, improved profitability in US Healthcare and a lower adjusted effective tax rate.

103. With respect to the US retail pharmacy and US pharmacy segments, Defendant Mahajan added, in relevant part:

> Comparable sales grew 3.5% year-on-year driven by brand inflation in pharmacy and prescription volume, partly offset by a decline in retail sales. AOI decreased 48% versus the prior year quarter. Approximately 70% of this decline relates to lower sale leaseback gains lapping reduced incentive accruals in the prior year and

> lower Cencora equity income. Challenging retail and pharmacy industry trends also negatively impacted AOI in the current period.
>
> *   *   *
>
> Let me now turn to U.S. pharmacy. Pharmacy comp sales increased 5.7% driven by brand inflation and volume growth. Comp scripts, excluding immunization, grew 1.7% in the quarter. We are tracking in line with the overall prescription market year-to-date. However, overall prescription market growth remains below expectations primarily due to Medicaid redeterminations.

104. Defendant Wentworth then discussed the Company's plans to potentially offset the lowered guidance, stating:

> So let me begin this discussion around our strategic decisions with our core business, US Retail Pharmacy. The success of the business hinges on an efficient, highly relevant customer experience, and we've launched a multifaceted action plan for improvement.
>
> As the convenient destination for millions of customers and driving $27 billion of retail sales, the store and its digital channels are central to our strategy and consumer experience. But the customer has evolved, demographics and preferences have shifted, and we need to reposition and operate our stores accordingly. ***Currently, 75% of our US stores contribute roughly 100% of segment AOI. For the remaining 25% of the stores in our network which are not currently contributing to our long-term strategy, changes are imminent***.
>
> *   *   *
>
> To start, we are finalizing a multifactor store footprint optimization program which we expect will include the closure of a significant portion of these underperforming stores over the next 3 years. Plans to finalize the number are in motion and we will update you in due course.
>
> For the remaining portion of this cohort, we are taking action to return them to profitability and deliver an improved customer experience. ***We will contemplate additional closures if performance does not improve, which includes external factors such as reimbursement rates***.

105. In response to an analyst's question about the future of pharmacy and projections' impact on WBA's plans for the pharmacy segment, Defendant Wentworth stated:

> As far as the future of pharmacy, retail pharmacy in particular, which we talk about the store as part of an overall experience. We are working to essentially meet the

> consumer where they are today and where they need us to be. And there are a number of elements to that, both in the back of the store and in the front of the store. And so – and I don't want to take as much time as it would take you in detail through all of those pieces.

106. In response to the same question concerning the future of pharmacy, Mary Langowski, the Company's EVP and President of the United States Healthcare division, continued:

> Quite frankly, we are laser-focused on being paid fairly for the value we provide. And put simply, ***the playbook is a bit dated and does not account for, nor does it adequately or fairly pay for, the role and value that we think the pharmacist is bringing and delivering services.***
>
> We also don't think it accounts adequately for the complexity that we now face in the system. And it certainly doesn't facilitate putting pharmacotherapy and behavioral interventions at the center of chronic disease management in this country. We think that has to change, and so we're collaborating with our PBM partners across the industry to make those changes.

107. With respect to the National Average Drug Acquisition Cost ("NADAC") pricing, Defendant Mahajan responded to an analyst's question, in relevant part:

> This -- so on NADAC, maybe a couple of thoughts. First, we've seen significant fluctuations in the last several months on the index itself. We had $20 million of impact in the quarter, ***but you got to think about that was a partial quarter impact.*** We have seen some improvement as the index, again, was updated in June. However, we are taking a very prudent approach as it relates to Q4 and the guidance for the year. And I'd say this is one of the reasons -- the fluctuations we've seen on NADAC is one of the reasons why we have the broader range as we put out the fiscal year guidance at this point.

108. Following a question regarding the discounting engaged in by the Company as well as on the potential for NADAC expansion from Medicaid, Defendant Wentworth replied:

> What I'd say is, first of all, as it relates to commercial and NADAC, I believe what Rick would say if I passed it over to him would be that, while we do have some commercial contracts that use NADAC, those conversations we're having around sort of neutrality in terms of outcomes. That's actually the easier part of NADAC, quite frankly. As it relates to the gross margin in pharmacy, I will pass it to Manmohan. And as I quickly would point out, gross margin is not only discounting, it is also mi and so forth. And so Manmohan, if you want to talk more about that.

109. Defendant Mahajan then expanded on the response, stating:

> So as you think about the gross margin on the retail pharmacy side, maybe a couple of things there. Let me start on the retail side. And what we've experienced in the third quarter, and we think the trend is going to continue in Q4***, is the environment didn't improve as we anticipated.*** And as a result, we focused on investing in price and promotion.
>
> Now we've seen the unit and sales uplift as a result thereof. But at the same time, there was impact on gross margin in the short term. And so that is coming through, and we expect that's going to continue along the same lines in Q4.
>
> The second piece that does impact our gross margin year-over-year is the level of shrink. And I think we talked about shrink in the last couple of calls as well. We have seen it on an increasing trend, and there are a number of actions that Tracey and the team are taking to bring it back to historical normals.

110. In response to analysts' questions regarding why prescriptions are not back to pre-pandemic levels and when WBA may be able to stabilize operating profit in the retail segment, Defendant Wentworth replied:

> ***As you've heard us say or let me make sure you hear us say, we actually have a really strong level of conviction around the core business that we are remodeling here.*** It will be a very different Walgreens in a lot of ways, a different experience.
>
> But by the same token, we see a clear stabilization and actual growth path for that business. ***It is going to take time. We're not going to give you guidance, but it's quarters, not months.*** It's not necessarily multiple years, but it is probably a period of time that we will have to demonstrate to you, and frankly to our consumer, that we are going to deserve their preference.
>
> As it relates to the share dynamics and sort of why share is growing more slowly. And you're right, it's not just Medicaid, although that does impact things. The Medicaid reenrollment challenges, by the way, which many of our urban stores could have played a role in if we were to have a closer relationship with Medicaid. And we are having some of those discussions do -- is one factor.

111. Defendant Gates then elaborated to discuss the pharmacy market more broadly, stating, in relevant part:

> ***And I think as you look at volume, I think we stated that we are growing with market right now.*** So it's not just a Walgreens thing. It is a market dynamic. And so when you look at Medicaid redetermination as an example, Medicaid enrollment

> really ballooned during the pandemic as obviously they were not moving people outside of the Medicaid coverage.
>
> And so what we've seen is that states has continued to move patients out. We're seeing upwards of -- closer to 18 million to 20 million individuals who have moved out of Medicaid coverage and either have to go out and find coverage like either discount cards, individual plans, or get into commercial plans. And so we've seen a dynamic where they actually have not picked up coverage as quickly, and utilization has dropped.
>
> And so what I think we're seeing is that, pandemic, we were running closer to 4%, 4.5% towards the end of it from a market growth perspective. Pre-pandemic, it was closer to 2.5%. ***And I think what we're seeing right now is we're actually running below the 2.5% from a market perspective. And obviously, we're trying to track with that***.

112. Following this news, WBA's stock price fell 22.16%, or $3.47 per share, to close at $12.19 per share on June 27, 2024.

***Harm to the Company***

113. As a direct and proximate result of the Individual Defendants' misconduct, WBA has lost and expended, and will lose and expend, millions of dollars.

114. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and CFO, and Chief Pharmacy Officer, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115. Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

116. Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

117. Further, during the Relevant Period, the Individual Defendants caused the Company to spend over $69.3 million to repurchase approximately 3,100,000 shares of its own common stock at artificially inflated prices in October 2023.

118. As set forth in the quarterly report filed with the SEC on January 4, 2024 (the "1Q24 10-Q"), the Company purchased 3,100,000 shares of its common stock between October 1, 2023 and October 31, 2023, at an average price of $22.37 per share, or a total of $69,347,000.

119. Further, as a direct and proximate result of the Individual Defendants' conduct, WBA has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

120. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

121. WBA is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

122. Plaintiff is an owner of WBA common stock and has been a continuous shareholder of Company stock at all relevant times.

123. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

124. A pre-suit demand on the Board of WBA is futile and, therefore, excused. At the

time this action was commenced, the twelve-member Board consisted of Individual Defendants Pessina, Wentworth, Graham, Babiak, Bhandari, Hanson, Huffines, Jarrett, Lederer, Polen, and Schlichting (the "Director Defendants") as well as non-party William H. Shrank. As set forth below, all eleven Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

125. The acts complained of herein constitute violations of fiduciary duties owed by WBA's officers and directors, and these acts are incapable of ratification.

126. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

127. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

128. Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

129. Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

130. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

131. Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

132. Defendants Babiak, Bhandari, Jarrett, and Schlichting (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

133. Additionally, Director Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth all solicited the 2023 Proxy filed pursuant to Section 14(a) of the Exchange Act with the SEC, which contained material misrepresentations and omissions. Accordingly, these ten Director Defendants breached their fiduciary duties, face a

substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

134. Further, the Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

## COUNT I

### Against The Individual Defendants For Violations of § 14(a) of the Exchange Act and Rule 10b-5

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

137. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

138. Under the direction and watch of the Director Defendants, the 2023 Proxy failed to disclose: (1) the Company's pharmacy division was not equipped to handle the ongoing challenges in the industry; (2) as a result, WBA overemphasized confidence in the pharmacy segment's ability to carry the Company; (3) the pharmacy segment would require significant restructuring to create a sustainable model; and (4) WBA did not have sufficient or effective risk management or compliance controls and procedures necessary to prevent such misstatements. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

139. Further, the 2023 Proxy failed to disclose that, among other things, the Individual Defendants were in violation of the Company's Code of Conduct and, despite the 2023 Proxy's statements concerning the Board's adherence to risk oversight functions and policies, the Board was not adequately exercising these functions and was causing or permitting the Company to issue false and misleading statements.

140. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy, including election of directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

141. The Company was damaged as a result of the Individual Defendants' material

misrepresentations and omissions in the 2023 Proxy.

## COUNT II

### Against The Individual Defendants For Violations of § 10(b) of the Exchange Act and Rule 10b-5

142. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

143. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144. The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

145. The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of WBA were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

146. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of WBA, their control over, and/or receipt and/or modification of WBA's allegedly

materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning WBA, participated in the fraudulent scheme alleged herein.

147. As a result of the foregoing, the market price of WBA common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of WBA common stock in purchasing WBA common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

148. In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## COUNT III

### Against The Individual Defendants For Breach Of Fiduciary Duty

149. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

151. The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

152. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153. Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, by failing to disclose: (1) the Company's pharmacy division was not equipped to handle the ongoing challenges in the industry; (2) as a result, WBA overemphasized confidence in the pharmacy segment's ability to carry the Company; (3) the pharmacy segment would require significant restructuring to create a sustainable model; and (4) WBA did not have sufficient or effective risk management or compliance controls and procedures necessary to prevent such misstatements. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

154. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

155. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

156. As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

157. Plaintiff, on behalf of WBA, has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

158. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

160. Plaintiff on behalf of WBA, has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants for Unjust Enrichment

161. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162. By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WBA.

163. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from WBA that was tied to the performance or artificially inflated valuation of WBA or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

164. Plaintiff, as a shareholder and a representative of WBA, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

165. Plaintiff, on behalf of WBA, has no adequate remedy at law.

## COUNT VI

### Against The Individual Defendants For Waste Of Corporate Assets

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

168. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending

the Company and its officers against the Securities Class Action.

169. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

170. Plaintiff, on behalf WBA, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of WBA and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing WBA to take all necessary actions to reform and improve its corporate governance and internal procedures to protect WBA and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Company's internal operational control functions;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2024

**THE BROWN LAW FIRM**

By: */s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
tjm@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085

# VERIFICATION

I, Lawrence Hollin, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Walgreens Boots Alliance, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____ day of _____________ 2024.

9/4/2024

Signed by:

Lawrence Hollin

940EF71032E3440...

Lawrence Hollin